1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9
10
11
12
13
14
15

| | |
|---|---|
| HELEN P. HOWELL, JILL K. STANTON, and JENNIFER L. RAMIREZ ROBSON,<br><br>      Plaintiffs,<br><br> v.<br><br>KING COUNTY HOUSING AUTHORITY, a public agency; and STEPHEN J. NORMAN, individually,<br><br>      Defendants. | NO.<br><br>COMPLAINT FOR DAMAGES, INJUNCTIVE AND FURTHER RELIEF<br><br>* * * **JURY DEMAND** * * * |

16
17
18
19
20
21
22
23

   Plaintiffs are experienced, high-level female executives who held public administration leadership positions at the King County Housing Authority under Executive Director Stephen J. Norman.  In violation of the Washington Law Against Discrimination, Washington Equal Pay and Opportunities Act, the United States Constitution, and 42 U.S.C. §§ 1981 and 1983, defendants discriminated against each of the plaintiffs based on gender; and against plaintiffs Helen P. Howell and Jennifer L. Ramirez Robson based on race.  Plaintiffs uncovered multiple wrongs and ongoing discrimination against women and people of color, some which spanned many years at the King County Housing Authority.  On behalf of themselves and other

employees, they opposed the discriminatory acts and sought agency-wide remedies. Defendants retaliated against them repeatedly. Each were forced to leave due to mistreatment and the intolerable work environment. Plaintiffs bring these claims for recovery of all damages sustained and for entry of Court-ordered mandatory relief to protect employees' civil rights and enforce compliance with anti-discrimination laws. They allege as follows:

## I.    PARTIES

1.1.    Plaintiff Helen P. Howell is and was a resident of King County, Washington at all relevant times. She is female and African American.

1.2.    Plaintiff Jill K. Stanton was a resident of Snohomish County, Washington at all relevant times. She is female and Caucasian.

1.3.    Plaintiff Jennifer L. Ramirez Robson is and was a resident of King County, Washington at all relevant times. She is female and Latinx.

1.4.    Defendant King County Housing Authority is an independent municipal corporation, existing and organized under the laws of the state of Washington since 1939. It is governed by a Board of Commissioners appointed by the King County Executive with approval by the Metro-King County Council. At relevant times, the Board was comprised of members Douglas Barnes, Chair, 2010 to present; Susan Palmer, Vice Chair, 2012 to present; Michael Brown, 2009 to 2021; Terry Lynn Stewart, 2014 to present; and John Welch, 2015 to present.

1.5.    Defendant Stephen J. Norman is and was a resident of King County, Washington at all relevant times. He was appointed by the Board and served as the Executive Director of the King County Housing Authority, its highest-level executive, from 1997 to 2021.

## II.    JURISDICTION AND VENUE

2.1.    Plaintiffs allege claims under the United States Constitution and federal statutes.

COMPLAINT FOR DAMAGES, INJUNCTIVE
AND FURTHER RELIEF - 2 of 33
{2340.01 - 00104794}

VREELAND LAW PLLC
CITY CENTER BELLEVUE
500 108TH AVENUE NE, SUITE 740
BELLEVUE, WASHINGTON  98004
(425) 623-1300 - FACSIMILE (425) 623-1310

2.2.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which grants district court jurisdiction over all civil actions arising under the Constitution, laws, or treaties of the United States.

2.3.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343(a)(4), which grants district court original jurisdiction over any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

2.4.     Plaintiffs allege claims under the laws of the state of Washington; and each submitted mandatory notice of tort claims to the King County Housing Authority on November 12, 2021, more than sixty (60) days prior to the filing of this action.  Plaintiffs have met and exhausted the claim filing requirement of state law, chapter 4.92 RCW.

2.5.     This Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367(a) because those claims arise out of the same case or controversy as the federal claims.

2.6.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because the acts and events giving rise to plaintiffs' claims took place in the Western District of Washington, where Stephen J. Norman is a resident and the King County Housing Authority is located.

## III.     STATEMENT OF FACTS

3.1.     The King County Housing Authority ("KCHA") is the largest housing authority in the state of Washington.  It is a grant recipient of funds from the U.S. Department of Housing and Urban Development ("HUD"), with an operating budget of over $300 million.  It employs approximately 400 employees, who provide a wide range of housing programs, resident support, and education to over 55,000 people in over 22,000 households.  It serves low-income

COMPLAINT FOR DAMAGES, INJUNCTIVE
AND FURTHER RELIEF - 3 of 33
{2340.01 - 00104794}

VREELAND LAW PLLC
CITY CENTER BELLEVUE
500 108TH AVENUE NE, SUITE 740
BELLEVUE, WASHINGTON  98004
(425) 623-1300 - FACSIMILE (425) 623-1310

populations in 33 cities and unincorporated King County.  The vast majority of that population is composed of women, racial and ethnic minorities, refugees and immigrants, including single-parent female households with children.  The majority of all residents served (55%) identify as "people of color" (not including Middle Eastern or Eastern Europe ethnicities); and approximately 73% of children served are Black, Indigenous, or People of Color.

3.2.    Stephen J. Norman ("Norman"), male and Caucasian, became the Executive Director of KCHA in 1997.  Following plaintiffs' complaints to the KCHA Board, the escalating exposure of allegations of long-term race and gender discrimination at KCHA, and the filing of the plaintiffs' three Tort Claims with KCHA, Norman resigned in December 2021.

3.3.    On July 14, 2014, plaintiff Jennifer L. Ramirez Robson ("Ramirez Robson"), Latinx female, started at KCHA as Director of Resident Services, reporting directly to Norman.  At that time, overall leadership of KCHA consisted of the following:

(a)    The Executive Leadership Team under Norman's direction was comprised of three White males in addition to Norman and one White female, namely,

- Dan Watson, Deputy Executive Director/Chief Development Officer, employed at KCHA since at least approximately 1979;

- Tim Walter, Senior Director of Development and Asset Management, employed at KCHA since at least approximately 2004 (who reported directly to Watson);

- Mike Reilly, Deputy Executive Director of Housing Management, employed at KCHA since at least approximately 1979; and

- Connie Davis, Deputy Executive Director/Chief Administrative Officer, employed by KCHA since approximately 1999.

(b)    The Senior Staff under Norman's direction was comprised of Department Directors plus the above Executive Team members, for a total of twenty (20) people, all of

COMPLAINT FOR DAMAGES, INJUNCTIVE
AND FURTHER RELIEF - 4 of 33
{2340.01 - 00104794}

whom were White men or women, with the exception of three (3) women of color:  Wen Xu, Donna Kimbrough, and Ramirez Robson.  There were no men of color on the Senior Staff.

3.4.      On April 16, 2018, plaintiff Jill K. Stanton ("Stanton"), female, started at KCHA as Deputy Executive Director/Chief Administrative Officer ("CAO") reporting directly to Norman.  She replaced Connie Davis on the Executive Leadership Team, which was comprised of the same four White males:  Norman, Watson, Walter, and Reilly.  The Senior Staff at that time still had only three women of color:  Ramirez Robson, Shawli Hathaway (Ramirez Robson's Assistant Director whom she added), and Wen Xu.  It still had no men of color.

3.5.      On February 25, 2019, after being heavily recruited by Norman since early 2018, plaintiff Helen P. Howell ("Howell"), African-American female, started at KCHA in a newly-titled position of Senior Director of Policy, Research and Social Impact Initiatives to report directly to Norman.  The Executive Leadership Team still consisted of the same group of four White males, and Stanton.  Howell was the first person of color and the first African-American woman to be on the Executive Leadership Team.  Howell was also to become a member of the Senior Staff.  At that time, it was comprised of only three women of color:  Ramirez Robson, Shawli Hathaway, and Wen Xu.

3.6.      When Ramirez Robson started at KCHA in 2014 as Director of Resident Services, she was not aware that Norman had set her salary very close to the bottom of the payband.  She had all the appropriate educational credentials, an Honorable Discharge from the U.S. Air Force, extensive employment history in various public agency roles, and significant community and volunteer leadership positions.  She interviewed with three separate panels at KCHA and was fully qualified and selected.  Her position was responsible for the direct and indirect supervision of over thirty-five (35) employees.  Although she reported directly to

**VREELAND LAW PLLC**
CITY CENTER BELLEVUE
500 108TH AVENUE NE, SUITE 740
BELLEVUE, WASHINGTON  98004
(425) 623-1300 - FACSIMILE (425) 623-1310

Norman, she was not on the Executive Leadership Team.  Watson and Reilly reported directly to Norman, Senior Director Walter reported to Watson—and all three were on the Executive Leadership Team.  Sometime later, Donna Kimbrough, the 2013 Human Resources ("HR") Director, told Ramirez Robson that her starting salary was too low and should have been higher, but that Norman personally controlled the salaries.

3.7.    Within a short time, Ramirez Robson observed that Norman was exceptionally harsh and overly critical of people of color, particularly African Americans; that he treated White women more harshly than White males; and that he appeared to give preferential treatment to White males.  His attitude permeated the agency and was prevalent with other male supervisors as well.  By way of example,

- Norman pushed her to fire a Black Senior Manager for no legitimate reason, stating only that he did not like the way the man spoke or his word usage, but she refused to do so.

- Norman required that she give a significant merit raise to one of her White male subordinates although his performance did not warrant such a big increase.  She pushed back, but Norman insisted and made the change with HR.

- Walter engaged in ferocious, inexplicable, and out-of-place attacks on another Black Senior Manager for missing a planning meeting although he had been excused in advance and Walter forced the issue to come up twice in performance reviews, requiring the coaching of the Manager's supervisor for the subordinate's conduct.

3.8.    Norman became increasingly abusive to Ramirez Robson during *all* their one-on-one meetings, which was observed by her Assistant Director, a multi-racial woman, whom she brought to the meetings to try to reduce Norman's attacks.  But soon Norman also began attacking the Assistant Director, too.  He constantly rebuked Ramirez Robson, rejected her

COMPLAINT FOR DAMAGES, INJUNCTIVE
AND FURTHER RELIEF - 6 of 33
{2340.01 - 00104794}

VREELAND LAW PLLC
CITY CENTER BELLEVUE
500 108TH AVENUE NE, SUITE 740
BELLEVUE, WASHINGTON  98004
(425) 623-1300 - FACSIMILE (425) 623-1310

comments with obvious disdain, and demeaned her.  Norman's mistreatment started in 2014 and continued non-stop.  Ramirez Robson felt he was trying to get her to quit.

3.9.    In March 2018, during a meeting also attended by HR Director Tonya Harlan, Norman was particularly vicious toward Ramirez Robson.  His battering caused her to break out into tears, but Norman completely ignored her.  Harlan later apologized to her, as Harlan was helpless to stop him.  At this point, Ramirez Robson's anxiety and fear were high.  Norman destroyed her self-confidence and self-esteem.  She wrote to him with careful language so as not to provoke his ire toward her, told him she had "near panic attacks" when she was to meet with him due to his treatment of her, and suggested mutual executive coaching to explore better communications.   He ignored her requests, offering no acknowledgment, solutions, or apologies.

3.10.    Norman did not conduct any performance reviews for Ramirez Robson from the outset of her employment in 2014 for four (4) years.  Such lack of reviews automatically denied her any merit increases.  Her compensation remained near the lowest point in the payband, which was even lower than some of her own subordinates.

3.11.    Finally, Norman set a date in August 2018 for a performance review.  Ramirez Robson completed the self-evaluation form, listing her accomplishments for each year through 2018, including for example having launched award-winning programs and managing a budget of $5–7M without overages.  At the short August meeting, Norman said nothing about her performance, stating only that she would now be reporting to Mike Reilly, a Deputy Executive Director.  Realigning her Department of Resident Services to report to Reilly created an internal conflict with housing management under his purview, and the position was now lower down on the organizational chart—a demotional step.

VREELAND LAW PLLC
CITY CENTER BELLEVUE
500 108TH AVENUE NE, SUITE 740
BELLEVUE, WASHINGTON  98004
(425) 623-1300 - FACSIMILE (425) 623-1310

3.12.    Ramirez Robson had good performance reviews from Reilly, and for the first time since 2014, she received some merit increases.  Norman continued to make disparaging and negative comments about her and her capabilities, including to Executive Leadership Team members—unsolicited and gratuitous.  He referred to her as a non-performer and ignored her completely as if she did not exist and had no value.  Norman's mistreatment included what was known in the workplace as *banishment*—removal from leadership and ignored—which Norman had done to other female employees in the past, including Judi Jones and Rhonda Rosenberg.

3.13.    Stanton started at KCHA in mid-April 2018.  Within one to two months, over twenty (20) people (including HR Director Harlan) talked to her about Norman's mistreatment of women, their extreme fear of him, and his belligerent tone and manner toward them.  They advised her that the only way to avoid or deflect his abuse was to humor him, to flatter him to ingratiate herself, and to even act flirtatious.  A professional executive, Stanton refused to stoop to such gender-based and sexist behaviors.  Within a few weeks after Stanton's predecessor left, Norman peppered her unrelentingly in a threatening and intimidating manner, interrupting, expressing irritation toward her, and demeaning her.  He also allowed others to denigrate her, including for example, Tim Walter, who sarcastically asked her during an executive meeting discussion, "Do you know what a capital account is?"

3.14.    Within the first two weeks, Stanton observed Norman screaming at his Administrative Assistant Jessica Olives, an African-American woman.  She often found Olives discouraged and in tears.  Norman abused Olives for years, and he demeaned her when she raised her desires for promotional opportunities.  It was so harmful to her that she quit in 2018 for a lesser paying job.

COMPLAINT FOR DAMAGES, INJUNCTIVE
AND FURTHER RELIEF - 8 of 33
{2340.01 - 00104794}

3.15.   Stanton's position as CAO included supervision of HR.  During the next several months of her employment, women staff described their complaints to Stanton about Norman's conduct, some which had been ongoing for years, including for example:

- Norman would yell at and belittle women repeatedly in person and in staff meetings, to the point where HR Director Harlan left work in tears after being personally attacked by Norman.

- Norman's abuse of Ramirez Robson was constant and Harlan could not stop him.

- Norman's conduct was modeled by other males in leadership who also mistreated female staff without accountability or correction, which permeated the agency, including misconduct reported against Craig Violante, Mark Abernathy, Tim Walter, John Eliason, Gary Leaf, Matt Peterson, Kevin Anderson, Jeb Best, and Bill Cook.

- In 2016–17, a consultant came to KCHA for anti-discrimination training and to address the culture of fear, but Norman got very angry, denied any personal responsibility, stormed out, and told Senior Staff to take care of it themselves.

- There had been unfair and inequitable compensation of women for years, with males paid at higher levels and even more than their female supervisor.

- HR Director Harlan reported that the dysfunction took up too much of her time.

3.16.   Stanton wanted to resolve the problems and remedy the workplace.  She made reports of claims of discrimination, bias and pay disparity, and violations of the sex harassment policy to Norman and also at Executive Leadership Team meetings.  But Norman and the all-male executives diminished the significance and made excuses for male behavior.  No action was taken at all other than what Stanton did on her own.  Throughout the Executive Leadership Team meetings, on most topics including her reports of discrimination, she was repeatedly interrupted, talked over, and treated dismissively.  She also reported experiencing disrespect

COMPLAINT FOR DAMAGES, INJUNCTIVE
AND FURTHER RELIEF - 9 of 33
{2340.01 - 00104794}

VREELAND LAW PLLC
CITY CENTER BELLEVUE
500 108TH AVENUE NE, SUITE 740
BELLEVUE, WASHINGTON  98004
(425) 623-1300 - FACSIMILE (425) 623-1310

and defiance from her male subordinates.  She worked directly with her own subordinates to try to improve their behavior.

3.17.    After she started at KCHA, Stanton first learned that Norman had set her starting salary at $40,000 per year *less than* any other Deputy Executive Director and *less than* even a Senior Director, Walter.  Her salary was also $20,000 a year *less than* the salary of two of her subordinate direct reports, Finance Director Violante and IT Director Leaf.  Stanton was fully qualified and selected for the CAO position:  she was a Certified Public Accountant with a BS Degree in Accounting, had a master's degree in Organizational Leadership, and had over 14 years' experience in public housing as an Accountant, Assistant Finance Director, Finance Director, and Deputy Executive Director of the Everett Housing Authority.  As CAO for KCHA, she was responsible for all administrative services, including finance, accounting, audits, IT, risk management, and human resources.

3.18.    Stanton also learned of many pay disparities, manipulations by Norman, and the failure to promote or even allow certain staff to apply for open positions, including by way of example:

- Pam Taylor, an African-American woman, was paid $3,000 *less per year* than her White peer in the same position; and nearly $10,000 *less per year* than a White colleague with a lesser role; and had raised pay inequities in her self-reviews for at least five (5) years.

- Therese Ross, an African-American woman and Assistant Director of HR, was qualified and desired to apply for the HR Director position.  She was expressly discouraged, told the pool of candidates was rich with more experienced applicants, and that they saw her as operational and not strategic.  She was promised the role of Associate Director as her only path forward, but that did not happen for another three (3) years.  In fact, the pool of candidates was not that good, and if Harlan had not accepted the position, KCHA planned to repost the job.

- Norman would work around the established paybands disregarding the rules, creating a new position or placing/promoting someone without any open postings, commonly known as "Stephen Specials" and which benefited White males. At the same time, Norman would revert to citing to the strict HR rules when convenient to reject promotions or opportunities for others.

3.19.   After approximately six (6) months, by late 2018, Stanton had become fearful of Norman's behavior, his bullying and intimidation tactics toward her, and his interference with her work. She talked with other Executive Leadership Team members who listened but did not offer any real support for change and would not stand up to Norman. Stanton was experiencing the "worst year" of her professional life and needed to leave the caustic workplace. She feared Norman's vindictiveness and sabotage if he knew she was looking to leave, and there were few similar positions.

3.20.   Stanton knew that Norman had been recruiting plaintiff Howell in 2018 and was relieved when she finally agreed to come to work at KCHA. Norman made many representations to Howell as to the scope, responsibilities, and agency-wide influence she would have in a new role he was developing for her, including working with her as a mentor in anticipation of succession planning for his Executive Director position. Norman repeated that he needed someone of her "caliber" and that she would be a member of the Executive Leadership Team. Howell had a BA degree from Vassar College, a Diploma in Legal Studies from Oxford University, and a law degree from Columbia University School of Law. She chose a career in public service, policy and leadership, and had served for example as Deputy Chief of Staff for Governor Gary Locke, as Director of the Washington State Department of Financial Institutions, and as Director of the Pierce County Human Service Department.

3.21.   Norman appeared very proud to have convinced Howell to come to KCHA. He spoke of her in a rather bragging manner and would repeatedly say she was "Black." Stanton

COMPLAINT FOR DAMAGES, INJUNCTIVE
AND FURTHER RELIEF - 11 of 33
{2340.01 - 00104794}

VREELAND LAW PLLC
CITY CENTER BELLEVUE
500 108TH AVENUE NE, SUITE 740
BELLEVUE, WASHINGTON  98004
(425) 623-1300 - FACSIMILE (425) 623-1310

advised him to stop referencing Howell's race, as it was inappropriate.  She also advised him that the classification of the prior position, before the new role was created for Howell, was at a payband two levels below others on the Executive Leadership Team and inadequate due to Howell's new role at KCHA and her experience.  However, Norman would not approve the payband classification change and kept the position in the same payband level as the prior, lesser position.

3.22.   Howell started in February 2019.  Norman set her salary in the lower payband and at the same level of her base salary in her last position as Executive Director of Building Changes, a non-profit organization.  He did not inform her that her salary was two paybands below all Executive Leadership Team members and was less than the lowest ranking member, Senior Director Walter, whose position was even classified in a higher payband.  The low comparative salary within KCHA leadership was not disclosed to her in advance of her acceptance of the job.

3.23.   Within a few months after starting at KCHA, Howell observed an agency-wide lack of respect toward women and people of color including promotional favoritism, pay disparities, and Norman's routine condescending behavior toward women, including by example the following:

- Two Black males had been terminated after a short time on staff, one reported discrimination with no apparent follow up by HR.

- Female staff had extreme fear and anxiety around Norman in the clearly male-dominated culture.

- The White males on the Executive Leadership Team did not want KCHA to participate in the Government Alliance on Race and Equity out of fear it would encourage staff to make complaints.

COMPLAINT FOR DAMAGES, INJUNCTIVE
AND FURTHER RELIEF - 12 of 33
{2340.01 - 00104794}

VREELAND LAW PLLC
CITY CENTER BELLEVUE
500 108TH AVENUE NE, SUITE 740
BELLEVUE, WASHINGTON  98004
(425) 623-1300 - FACSIMILE (425) 623-1310

- Norman made a very inappropriate sexual innuendo comment and made comments which completely stifled discussion of gender issues.

- Norman denigrated Ramirez Robson without any explanation and engaged in name-calling and undermining her with the Executives.

- Black staff made complaints that White males were given promotions, whereas Blacks and others had to compete for them; that Norman engaged in an internal succession process with the higher-level positions and favored White males; and that positions were designated for certain favored White males without a competitive open search.

- Kristy Johnson, a Senior Director and long-term employee who generated significant grants, was underpaid compared to a male Senior Administrative Program Manager with a substantially lesser role in the same division who had been given a large raise by Norman to which Ramirez Robson had disagreed.

3.24.   Howell also observed Norman's constant open shaming of Stanton in Executive Leadership Team meetings, which was particularly harsh and hostile compared to the way he treated the males, all of whom frequently talked over Stanton.  She learned that Stanton's compensation was significantly lower than the other Deputy Executive Directors and that her own compensation was also very low and much less than any of the White men on the Executive Leadership Team.

3.25.   Howell was particularly shocked hearing all the reports and complaints as well as her own observations in light of the mission of KCHA and the populations it served.  She reported the seriousness and scope of the complaints and workplace environment to Norman. Norman did nothing.

3.26.   Norman then began treating Howell dismissively and like a glorified assistant. Instead of substantive policy work, he requested she schedule meetings, proofread, and make copies.  He would not permit her to present substantively at a series of agency meetings which included large numbers of staff, but would take over and interrupt her.  His behavior was similar

COMPLAINT FOR DAMAGES, INJUNCTIVE
AND FURTHER RELIEF - 13 of 33
{2340.01 - 00104794}

to her observations of his treatment of other women leaders—demeaning their ability and work, ignoring them, and reducing the import of their roles or stature in the agency.  She told Norman in late spring 2019 that she wanted to resolve problems and work for change at KCHA, reporting to him that she felt like a "token" and was experiencing race and gender discrimination.  She reported that Stanton was underpaid compared to others in executive roles and even less than her direct male subordinates.  There was no change.  Norman did nothing.

3.27.   Again, in late spring or early summer 2019, Howell raised with Norman the Stanton pay disparity and workplace issues, suggesting steps and options for improvements.  Norman's response was to double down on her—he talked down to her, diminished her experience, told her she had a lot to learn about housing, ignored her reports, and did not address the issues she raised.  He distanced himself more from Howell.  His behavior was a full reversal of his conduct while recruiting her.

3.28.   Stanton observed Norman's change in treatment of Howell even before the end of May 2019—Norman was treating her as a personal secretary.  When Howell raised reports of discrimination and racial problems at KCHA during Executive Leadership Team meetings, Norman reacted with anger and ignored her and her reports.

3.29.   Stanton told Norman several times that Howell had become "tokenized" and pressed him to allow her to do the job for which she was hired.  He denied it.  Stanton noted at an Executive Leadership Team meeting, in Howell's absence, that her pay was two bands below all others and that her pay and classification smacked of "tokenism."  Norman responded, "It has been noted," and changed the subject.  Nothing was done.  Stanton frequently discussed the problem with Watson and Walters, separately, and both acknowledged that the mistreatment of

COMPLAINT FOR DAMAGES, INJUNCTIVE
AND FURTHER RELIEF - 14 of 33
{2340.01 - 00104794}

VREELAND LAW PLLC
CITY CENTER BELLEVUE
500 108TH AVENUE NE, SUITE 740
BELLEVUE, WASHINGTON  98004
(425) 623-1300 - FACSIMILE (425) 623-1310

Howell appeared to be racist and discriminatory, but they did nothing and did not speak up to Norman.

3.30.   Stanton learned that Norman had *banished* Rhonda Rosenberg years ago, that she did not receive a merit increase for ten (10) years, that he rarely spoke to her, that he mistreated other female staff, and that he frequently had temper outbursts, even punching a file cabinet.  No one had confronted him about his misconduct.  Stanton made it clear to him that he needed to rectify the relationship with Rosenberg, to provide her a legitimate raise, and to resolve the issues, as it created a significant financial and public relations risk to KCHA. Norman blamed Rosenberg for the difficulties, but Stanton persisted, and things improved for Rosenberg.

3.31.   No one at KCHA responded to the issues and reports made by Howell throughout 2019 and those made by Stanton since mid-2018 (other than as regards to Rosenberg).  The need for discrimination training became more acute due to the complete mishandling of a sexual harassment complaint.  The males on the Executive Leadership Team lacked knowledge of the basic concepts and refused to follow the recommendation of HR, ultimately later resulting in a discrimination claim against KCHA.  Stanton brought in a trainer for the Executive Leadership Team, but Norman, Walter, and Watson reacted poorly, interrupted throughout, were defensive and argumentative, and ignored the trainer—a woman. Both Stanton and Howell pressed for more extensive consulting work with all Senior Staff, recognizing the need for a major culture change at KCHA from the top down.

3.32.   On November 20, 2019, Norman verbally attacked Howell in a budget meeting, publicly humiliating her.  He raised his voice to her, rudely stated she was outright wrong, and accused her of being unprepared.  It was so abusive that staff continued to discuss the attack

VREELAND LAW PLLC
CITY CENTER BELLEVUE
500 108TH AVENUE NE, SUITE 740
BELLEVUE, WASHINGTON  98004
(425) 623-1300 - FACSIMILE (425) 623-1310

the next day.  Several men and women commented on Norman's inappropriate behavior.
Howell sent a written complaint to him, and others convinced him to write an apology.  But the
damage was done.

3.33.   Norman's mistreatment of Howell continued.  She also noted his pattern of
disparate treatment of female staff.  By way of example only, and in contrast to his treatment
of men, Norman would grill women who were reporting, questioning them excessively in a
concerted, controlling manner until he found an area in which he could publicly criticize or
chastise them.  HR Director Harlan referred to his inappropriate conduct as "sniffing out a
weakness."  Norman used various manipulations to intimidate and demean female staff.
Despite his conduct, Howell continued to seek to have the agency-wide effects of discrimination
and workplace hostilities addressed and corrected.

3.34.   In January 2020, Stanton pressed to have a consultant, Archbright, conduct a
training to combat fear and intimidation.  Because the training did not expressly appear to be
anti-discrimination training, which had not met with support from leadership, it was seen as a
first step toward improvement by Stanton.  A one-day "civility" training was attended by Senior
Staff.  Norman failed to attend the follow-up with Senior Staff.

3.35.   In February 2020, Howell again brought up Stanton's pay disparity with
Norman.  She stated that the earlier merit increase was insufficient, and that a pay adjustment
was necessary due to inequitable compensation to Stanton over time.  At Stanton's first-year
review in 2019, Norman offered a 6% merit raise and Stanton objected stating she was
underpaid and undervalued and asked for the maximum.  Norman then authorized a 7% merit
increase, but the large pay disparity had not been resolved.  Before Stanton's second-year
review in the spring of 2020, not only did Howell press Norman, but Stanton complained of

COMPLAINT FOR DAMAGES, INJUNCTIVE
AND FURTHER RELIEF - 16 of 33
{2340.01 - 00104794}

VREELAND LAW PLLC
CITY CENTER BELLEVUE
500 108TH AVENUE NE, SUITE 740
BELLEVUE, WASHINGTON  98004
(425) 623-1300 - FACSIMILE (425) 623-1310

unequal pay and sought actual equity. A consultant from Greatheart Consulting, Chuck Shelton, also told Norman that Stanton's pay was not only inequitable but discriminatory. Norman then finally raised her pay to be equal to that of Reilly and Walter, giving her a 7% flat salary increase and a 7% merit raise. Norman did not provide back pay to address the historic disparity since April 2018.

3.36.   Despite the efforts with training, there were no changes in Norman's attitude and conduct or his treatment of Stanton or Howell. The male Executive Leadership Team members still did not speak up. There was no improvement in the toxic and discriminatory culture or hostile workplace. Many of their past complaints had been verbal, so Stanton sent an email to Norman and the Executive Leadership Team listing problems that she and Howell had raised. The email chain ran from April 17 to April 19, 2020, with Howell joining in the written reports and adding details of pervasive gender bias, pay inequities between male and female Senior Staff, mistreatment of women by male employees, and the lack of men of color in leadership.

3.37.   The hostility from Norman continued and seemed to escalate. He screamed for quite some time at Stanton by telephone on an unrelated matter. He gave lip service only to Howell. He said he took the complaints seriously, and Howell pressed that he needed to do something, to take action.

3.38.   On June 1–2, 2020, Stanton and Howell again sent emails to Norman that the issues needed to be addressed, including lack of equal treatment in promotions for women and people of color, ongoing problems around gender and racial bias, tokenism, bullying, and other patterns of abuse and disparate treatment at KCHA. Norman continued to state that he took the problems seriously, but he took no action, and his conduct did not change.

COMPLAINT FOR DAMAGES, INJUNCTIVE
AND FURTHER RELIEF - 17 of 33
{2340.01 - 00104794}

VREELAND LAW PLLC
CITY CENTER BELLEVUE
500 108TH AVENUE NE, SUITE 740
BELLEVUE, WASHINGTON  98004
(425) 623-1300 - FACSIMILE (425) 623-1310

3.39.    In June 2020, Norman finally told Board Chair Doug Barnes there were concerns of discrimination raised by Howell and Stanton, but he did not detail them and did not propose any investigative or remedial process to Barnes.  Neither Stanton nor Howell received any substantive response from Norman, the Executive Leadership Team, Barnes, or the Board.

3.40.    In July 2020, the Senior Staff participated in a training entitled "Introduction to Systemic Racism," which was arranged by Howell and recommended by a staff member from Bellwether Housing.  Staff were invited at one point in the training to provide feedback as to whether racism is manifested at KCHA.  They reported:  upper-level executives/managers were principally White; pay inequity existed between men and women; leadership lacked support for diversity, equity, and inclusion; inequitable resident housing evictions were based on subjective belief as to who is more deserving; ignoring workplace issues; and a work culture existed that was dominated by White males and imbalance with lost opportunities for others.  KCHA took no action on these issues.

3.41.    Norman ratcheted up his mistreatment of Howell in their meetings.  In particular, on August 19, 2020, he was hostile and seething, battering her with questions and demands regarding details of minutia, not allowing her to answer.  This "firing squad" interrogation method was well known by Ramirez Robson and Stanton.  Instead of a high-level strategic meeting on programs, it was a 45-minute harangue by Norman.  She was finally able to ask why he removed her from his calendar access, and he quickly replied, "To be candid Helen, you're involved with complaints against the Housing Authority."  He admitted his retaliatory mind-set or *animus*.

3.42.    At the end of August 2020, Howell, following the KCHA employee handbook policies, made a written complaint directly to the Board.  Although she was aware that Norman

had sent some emails to the Board Chair nearly three months earlier, nothing had changed and the mistreatment and retaliation by Norman had escalated.

3.43.    In August/September 2020, KCHA engaged new legal counsel, who then engaged another legal firm to "conduct interviews."  The stated scope of that process was extremely narrow and did not address the actual discrimination issues that had been repeatedly raised.  Howell noted her disappointment with the limited scope of the interviews to the Board and was then informed that the scope would be expanded.  Stanton and Howell volunteered to be interviewed, as they then understood it would be a comprehensive investigation of the long-standing discriminatory practices at KCHA, the staff complaints reported to them, and their own complaints of disparate treatment, retaliation, and inequitable pay.  However, they soon realized they were being investigated as *adversaries* to KCHA by KCHA's legal counsel, who was combative, accusatory, and challenged their motives and credibility.  Howell reported this questionable treatment to the Board on September 24, 2020, and she also reported to KCHA's legal counsel during the interviews of more retaliatory conduct by Norman.  Likewise, Stanton felt attacked and blamed by KCHA's legal counsel during her extensive interviews and sent her written complaints to the Board.

3.44.    Ramirez Robson had earlier informed Stanton of the disparate treatment she had suffered from Norman and his mistreatment of female staff.  Ramirez Robson was not aware that Howell or Stanton had elevated any discrimination complaints to the Board or what the scope of the problems were at KCHA.  She had heard there were investigation interviews underway concerning discrimination, and she agreed to be interviewed.  She was concerned about retaliation if she made full reports about Norman in her interview but believed that finally something was actually being done.  She was open in her interview about Norman's

mistreatment of her.  KCHA's legal counsel even told her that Norman placing her under Reilly's supervision was retaliation and apologized to her.

3.45.   At that time during the fall of 2020, Howell had been assigned and was performing additional duties due to Reilly's retirement, leading two full departments.  But Norman's mistreatment of her still continued:  he removed her from group emails; increased his micro-management; and interfered with her ability to get her work done, bombarding her with unanticipated and non-urgent minutia and demands, and requiring written briefings at the last minute before she was to take the first vacation since she started in February 2019.

3.46.   Norman also continued to mistreat Stanton, avoiding her and working around her going directly to her subordinates.  He engaged in the well-known *banishment* conduct by distancing her from authority and undermining her with staff, as he had done with other women in the past who disagreed with him.  HR Director Harlan began to take direction from Norman, rather than Stanton, her direct supervisor.

3.47.   For both Howell and Stanton, the work environment became so intolerable in late 2020, that they each were compelled to leave KCHA.  The hostile work environment, retaliation, disparate treatment, and failures to remedy were overwhelming and harmful to each of them.

3.48.   Howell knew she had no choice but to leave KCHA.  She fortuitously received an unsolicited invitation to take over as Interim Director for the City of Seattle Human Services Department, a short-term position.  She accepted the job and gave notice to KCHA on December 2, 2020, that she would be leaving following her return from vacation.  Even then, she received a discrimination complaint from an African-American male at KCHA and forwarded it to KCHA's legal counsel.

COMPLAINT FOR DAMAGES, INJUNCTIVE
AND FURTHER RELIEF - 20 of 33
{2340.01 - 00104794}

3.49.    Stanton could no longer continue with the mistreatment or be associated with the race and gender hostilities against others.  She knew she had no choice but to leave KCHA. She gave notice on December 11, 2020.

3.50.    Howell's last day at KCHA was December 15, 2020, and Stanton's last day was January 8, 2021.  Many of the women and people of color still at KCHA expressed great disappointment and fear when the two left.  The two highest-ranking females at KCHA, one of whom was the first woman of color on the Executive Leadership Team, had been run out of the agency after their reports of race and gender discrimination, pay inequity, and bullying to Norman and the Board.

3.51.    Ramirez Robson was very discouraged when Stanton and Howell gave notice to leave, as she had great hopes they could finally effect change and remedy the discrimination and pay disparities.  She heard disturbing criticisms from IT Director Leaf, who stated that Howell was a "trouble-maker" and that Stanton had "fallen in with her cult" to harm Norman and KCHA.  Ramirez Robson was aware that this was the same type of derogatory and belittling name-calling that Norman directed toward women or African-Americans over the years, especially those whom he perceived were questioning or challenging him in any way.

3.52.    Ramirez Robson was so concerned by these comments that she contacted Board member Michael Brown.  He told her that there were complaints about the investigatory interview process and advised her to contact Board members Welch and Palmer.  On December 18, 2020, Ramirez Robson told Welch and Palmer about the discrediting of Howell and Stanton and made complaints about the interview/investigative process.  At that time, no information from the interviews had been disclosed by KCHA to anyone outside the board members, Norman, and likely the Executive Leadership Team.  Ramirez Robson followed up with an

COMPLAINT FOR DAMAGES, INJUNCTIVE
AND FURTHER RELIEF - 21 of 33
{2340.01 - 00104794}

VREELAND LAW PLLC
CITY CENTER BELLEVUE
500 108TH AVENUE NE, SUITE 740
BELLEVUE, WASHINGTON  98004
(425) 623-1300 - FACSIMILE (425) 623-1310

email describing her serious fears that without Howell or Stanton, there was no buffer and she would experience retaliation from Norman or others for opposing the disparate treatment in her interview with KCHA's legal counsel.

3.53.    In February 2021, Ramirez Robson learned that KCHA's legal counsel had reported outright false information and lies from Norman (*e.g.*, contrary to his statement, he had never provided her with any performance reviews or merit increases, which could have been verified by KCHA personnel files proving the truth of her statements).  She was horrified and outraged at how she had been portrayed, and distressed and worried about her professional reputation both inside and outside the agency.  She reported to Board members Palmer and Welch that the investigation was used to protect KCHA and discredit people who spoke up, and she wished she had never participated.

3.54.    The treatment of Ramirez Robson never improved.  She had suffered in the hostile work environment since 2014, without remedy, and was simply exhausted.  Her working conditions were intolerable, and she knew she had no choice but to leave KCHA.  It took some time for her to find new employment.  On information and belief, Norman interfered with potential job prospects by discrediting and maligning her, directly or indirectly.  She finally was able to leave KCHA on July 9, 2021.

3.55.    Howell, Stanton, and Ramirez Robson have each been harmed in numerous ways as a result of the wrongful conduct of Norman and of KCHA.  They have each suffered from discriminatory disparate treatment, inequitable pay, inequitable career opportunities, retaliation, hostile work environment, and diminution and interference with their professional careers and their advancement trajectory and income.  They have suffered economic and non-

COMPLAINT FOR DAMAGES, INJUNCTIVE
AND FURTHER RELIEF - 22 of 33
{2340.01 - 00104794}

VREELAND LAW PLLC
CITY CENTER BELLEVUE
500 108TH AVENUE NE, SUITE 740
BELLEVUE, WASHINGTON  98004
(425) 623-1300 - FACSIMILE (425) 623-1310

economic damages, including anxiety, fear, anguish, loss of enjoyment of life, humiliation, embarrassment, fear, and personal indignity.

3.56.   The conduct, acts and omissions by Norman, the CEO and highest-ranking executive of KCHA, is imputed to KCHA, and constitutes not only individual acts of discrimination and retaliation but constitutes a pattern and practice over a long period of time against women and people of color.

## IV.   FIRST CAUSE OF ACTION
### Violations of Washington's Law Against Discrimination, Chapter 49.60 RCW
### (against both Defendants)

4.1.   Plaintiffs reallege above paragraphs 1.1 through 3.56.

4.2.   The conduct, acts and/or omissions of defendants constitute independent, separate acts in violation of chapter 49.60 RCW as follows:

(a)   disparate discriminatory treatment and hostile work environment based on gender, as to each plaintiff individually;

(b)   unequal and/or inequitable pay based on gender as to each plaintiff individually,

(c)   disparate discriminatory treatment and hostile work environment based on race, color, or national origin (ancestry) as to plaintiff Ramirez Robson;

(d)   disparate discriminatory treatment and hostile work environment based on race, color, or national origin (ancestry) as to plaintiff Howell; and

(e)   retaliation for engaging in protected and/or opposition activity as to each plaintiff individually arising from their individual, and at times collective, reports of what each reasonably believed to be discriminatory conduct against each of them or on behalf of others.

4.3.   Each such act or acts, singularly and/or collectively, are in violation of chapter 49.60 RCW for which KCHA is liable.

VREELAND LAW PLLC
CITY CENTER BELLEVUE
500 108TH AVENUE NE, SUITE 740
BELLEVUE, WASHINGTON  98004
(425) 623-1300 - FACSIMILE (425) 623-1310

1      4.4.      The conduct, acts and/or omissions of defendant Norman acting on behalf of his employer constitute violations of chapter 49.60 RCW, for which he is personally and individually liable pursuant to RCW 49.60.040(11) and in accordance with the principles established under *Brown v. Scott Paper Worldwide Co.*, 143 Wn.2d 349, 358, 361 (2001).

4.5.      Defendant Norman also engaged in acts or conduct which constitutes aiding, abetting, encouraging, and/or inciting the commission of the discriminatory acts against each of plaintiffs in violation of RCW 49.60.220, and/or attempting to obstruct or prevent defendant KCHA or others from complying with the provisions of the WLAD, for which he is personally and individually liable.

4.6.      The acts, omissions and/or conduct of defendant Norman are imputed to KCHA for which it is strictly liable.  The acts, omissions and/or conduct of its male executive leadership, including Dan Watson and Tim Walter, are also imputed to KCHA, for which it is also strictly liable.

4.7.      As a result of the discriminatory and retaliatory acts in violations of chapter 49.60 RCW, each plaintiff has been injured and damaged in an amount to be proven at trial, for which each is entitled to recover all her actual and compensatory, economic and non-economic, special and general damages, past and future.

4.8.      Plaintiffs are each further entitled to recover her costs, litigation expenses, and reasonable attorneys' fees against defendants pursuant to chapter 49.60 RCW; interest on economic damages as liquidated amounts, and compensation in the form of a gross-up to account for the increased amount of federal tax liability on economic damages awarded.

COMPLAINT FOR DAMAGES, INJUNCTIVE
AND FURTHER RELIEF - 24 of 33
{2340.01 - 00104794}

VREELAND LAW PLLC
CITY CENTER BELLEVUE
500 108TH AVENUE NE, SUITE 740
BELLEVUE, WASHINGTON  98004
(425) 623-1300 - FACSIMILE (425) 623-1310

## V.   SECOND CAUSE OF ACTION
### Violations of the Washington Equal Pay and Opportunities Act, Chapter 49.58 RCW
### (against Defendant KCHA)

5.1.     Plaintiffs reallege above paragraphs 1.1 through 3.56.

5.2.     The conduct, acts and/or omissions of defendant KCHA in failing to compensate each of the plaintiffs commensurate with similarly employed males constitute independent, separate acts of inequitable pay based on gender in violation of the Washington Equal Pay and Opportunities Act, chapter 49.58 RCW, and its predecessor and common law.

5.3.     Defendant KCHA's conduct is contrary to the Legislature's express declaration of public policy underlying the Act and its express prohibitions.   Pursuant to RCW 49.58.020(3)(d), to advance that public policy, an individual's previous wage or salary history is not a defense to a claim for inequitable compensation.

5.4.     The conduct, acts and/or omissions of defendant KCHA in failing to provide equality of career advancement opportunities with males constitute (a) a pattern of violations as to each individual plaintiff, and/or (b) a violation through application of a formal or informal employer policy or practice under the Washington Equal Pay and Opportunities Act, chapter 49.58 RCW.

5.5.     The conduct, acts and/or omissions of defendant KCHA in retaliation against each plaintiff for engaging in protected activity on her own or on others' behalf for equitable pay and equality of career advancement opportunities are prohibited by and in violation of the Washington Equal Pay and Opportunities Act, chapter 49.58 RCW, specifically RCW 49.58.040 and 050.

5.6.     As a result of the discriminatory and retaliatory acts in violation of chapter 49.58 RCW, each plaintiff has an express right of civil action for recovery of damages.  Each plaintiff

VREELAND LAW PLLC
CITY CENTER BELLEVUE
500 108TH AVENUE NE, SUITE 740
BELLEVUE, WASHINGTON  98004
(425) 623-1300 - FACSIMILE (425) 623-1310

1  has been injured in an amount to be proven at trial, for which each is entitled to recover all

2  actual damages, plus statutory damages equal to actual damages or $5,000 *whichever is greater*,

3  interest at one percent (1%) per month on all compensation owed, and costs and reasonable

4  attorneys' fees, all pursuant to RCW 49.58.070.

## VI.    THIRD CAUSE OF ACTION
**Violation of the Civil Rights Act of 1866, *as amended*, 42 U.S.C. § 1981, as to
Plaintiffs Howell and Ramirez Robson Based on Race
(against Defendant KCHA and Defendant Norman in his personal capacity)**

6.1.    Plaintiffs reallege above paragraphs 1.1 through 3.56.

6.2.    Defendants KCHA and Norman in his personal capacity discriminated against

both plaintiff Howell (African American) and plaintiff Ramirez Robson (Latinx) in the terms

and conditions of their employment based on race in violation of the Civil Rights Act of 1866,

*as amended*, 42 U.S.C. § 1981.

6.3.    Defendants created, allowed, and/or maintained a hostile work environment on

the basis of race in violation of the Civil Rights Act of 1866, *as amended*, 42 U.S.C. § 1981.

6.4.    Defendants engaged in retaliation in violation of the Civil Rights Act of 1866,

*as amended*, 42 U.S.C. § 1981.

6.5.    Defendant KCHA, as directed, permitted, engaged in, conducted and maintained

by defendant Norman, had a policy and/or custom to maintain a discriminatory and hostile work

environment and/or had a policy and/or custom of deliberate indifference to the existence of

discrimination and a hostile work environment.  KCHA maintained a persistent, widespread,

long-term and/or well-established practice of discrimination; and KCHA allowed its

management and supervisory employees to engage in discriminatory and retaliatory conduct,

subjecting plaintiffs and other employees to a hostile work environment based on race.

**VREELAND LAW PLLC**
CITY CENTER BELLEVUE
500 108TH AVENUE NE, SUITE 740
BELLEVUE, WASHINGTON  98004
(425) 623-1300 - FACSIMILE (425) 623-1310

6.6.    Defendant KCHA also failed to adequately implement and/or enforce its anti-discrimination policies and/or adequately or properly train its employees.

6.7.    The acts, omissions, conduct and failures of defendant KCHA constitute deliberate indifference to the civil rights of plaintiff Howell and of plaintiff Ramirez Robson under federal law.

6.8.    As a result of the violations of the Civil Rights Act of 1866, *as amended*, 42 U.S.C. § 1981, plaintiff Howell and plaintiff Ramirez Robson each have been injured and damaged in an amount to be proven at trial, for which they are each entitled to recover all actual and compensatory, economic and non-economic, special and general damages.

6.9.    Plaintiffs each are further entitled to an award for her costs, litigation expenses, and reasonable attorneys' fees pursuant to the Civil Rights Attorney's Fee Awards Act of 1976, 42 U.S.C. § 1988, and other authority.

6.10.   The conduct, acts, and/or omissions of defendant Norman constitute willful, deliberate, reckless, or callous indifference to and/or reckless disregard for the civil rights of plaintiff Howell and of plaintiff Ramirez Robson, and/or arose from ill will, malice, evil motive or intent, giving rise to an award of punitive damages as to each plaintiff against defendant Norman under the Civil Rights Act of 1866, *as amended*, 42 U.S.C. § 1981, 42 U.S.C. §1981a, and other authority.

### VII.    FOURTH CAUSE OF ACTION
**Violation of Equal Protection Clause to the United States Constitution
and the Civil Rights Act of 1871, *as amended*, 42 U.S.C. § 1983,
as to all Plaintiffs Based on Gender
(against Defendant KCHA and Defendant Norman in his personal capacity)**

7.1.    Plaintiffs reallege above paragraphs 1.1 through 3.56.

COMPLAINT FOR DAMAGES, INJUNCTIVE
AND FURTHER RELIEF - 27 of 33
{2340.01 - 00104794}

7.2.     Defendants discriminated against each plaintiff in the terms and conditions of employment based on gender, and defendants discriminated against plaintiff Howell and plaintiff Ramirez Robson in the terms and conditions of employment based on race.   The conduct, acts or omissions of defendants violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and the Civil Rights Act of 1871, *as amended*, 42 U.S.C. § 1983.

7.3.     Defendants created, allowed, and/or maintained a hostile work environment on the basis of the plaintiffs' gender, and on the basis of race at to plaintiff Howell and plaintiff Ramirez Robson in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and the Civil Rights Act of 1871, *as amended*, 42 U.S.C. § 1983.

7.4.     Defendants engaged in retaliation against all plaintiffs in violation of the Civil Rights Act of 1866, *as amended*, 42 U.S.C. § 1983.

7.5.     Defendant KCHA, as directed, allowed, engaged in, conducted and maintained by defendant Norman, had a policy and/or custom to maintain a discriminatory and hostile work environment and/or had a policy and/or custom of deliberate indifference to the existence of discrimination and a hostile work environment.   KCHA maintained a persistent, widespread, long-term and/or well-established practice of discrimination; and KCHA allowed its employees to discriminate and subject plaintiffs and other employees to a hostile work environment based on gender and race.

7.6.     Defendant KCHA also failed to adequately implement and/or enforce its anti-discrimination policies and/or adequately or properly train its employees.

COMPLAINT FOR DAMAGES, INJUNCTIVE
AND FURTHER RELIEF - 28 of 33
{2340.01 - 00104794}

VREELAND LAW PLLC
CITY CENTER BELLEVUE
500 108TH AVENUE NE, SUITE 740
BELLEVUE, WASHINGTON  98004
(425) 623-1300 - FACSIMILE (425) 623-1310

7.7.    The acts, omissions, conduct, and failures of defendant KCHA constitute deliberate indifference to the civil rights of each of the plaintiffs under the United States Constitution and federal law.

7.8.    As a result of the violation(s) of the Civil Rights Act of 1871, *as amended*, 42 U.S.C. § 1983, plaintiffs each have been injured and damaged in an amount to be proven at trial, for which each is entitled to recover all actual and compensatory, economic and non-economic, special and general damages.

7.9.    Plaintiffs each are further entitled to an award for her costs, litigation expenses, and reasonable attorneys' fees pursuant to the Civil Rights Attorney's Fee Awards Act of 1976, 42 U.S.C. §1988, and other authority.

7.10.   The conduct, acts, and/or omissions of defendant Norman constitute willful, deliberate, reckless, or callous indifference to and/or reckless disregard for the civil rights of each of the plaintiffs, and/or arose from ill will, malice, evil motive or intent, giving rise to an award of punitive damages as to each plaintiff against defendant Norman pursuant to the Civil Rights Act of 1871, *as amended*, 42 U.S.C. §1983, 42 U.S.C. §1981a, and other authority.

## VIII.   FIFTH CAUSE OF ACTION
### Violation of Title VI of the Civil Rights Act of 1964
### and the Civil Rights Act of 1871, *as amended*, 42 U.S.C. § 1983, as to
### Plaintiffs Howell and Ramirez Robson Based on Race and
### as to all Plaintiffs Based on Retaliation
### (against Defendant KCHA)

8.1.    Plaintiffs reallege above paragraphs 1.1 through 3.56.

8.2.    Title VI of the 1964 Civil Rights Act, 42 U.S.C. § 2000d provides ("Title VI") provides that no person in the United States shall be subject to discrimination on the grounds

COMPLAINT FOR DAMAGES, INJUNCTIVE
AND FURTHER RELIEF - 29 of 33
{2340.01 - 00104794}

VREELAND LAW PLLC
CITY CENTER BELLEVUE
500 108TH AVENUE NE, SUITE 740
BELLEVUE, WASHINGTON  98004
(425) 623-1300 - FACSIMILE (425) 623-1310

1    of race, color, or national origin under any program or activity receiving Federal financial

2    assistance.

3        8.3.    At all relevant times, defendant KCHA was a grant recipient of substantial

4    federal funding and financial assistance from HUD, which was and is utilized for KCHA

5    operating expenses.

6        8.4.    Defendant KCHA, and through its Executive Director Norman, intentionally

7    treated both plaintiff Howell (African American) and plaintiff Ramirez Robson (Latinx)

8    differently, and discriminated against them in their terms and conditions of employment based

9    on their race, color, or national origin in violation of Title VI, and/or knowingly caused them

10   harm because of their race, color, or national origin.

11       8.5.    Defendant KCHA, and through its Executive Director Norman, engaged in

12   retaliation against all three plaintiffs in violation of Title VI.

13       8.6.    As a result of the wrongful conduct, defendant KCHA has violated the Civil

14   Rights Act of 1871, *as amended*, 42 U.S.C. § 1983, and plaintiffs each have been injured and

15   damaged in an amount to be proven at trial, for which each is entitled to recover all actual and

16   compensatory, economic and non-economic, special and general damages.

17       8.7.    Plaintiffs each are further entitled to an award for her costs, litigation expenses,

18   and reasonable attorneys' fees pursuant to the Civil Rights Attorney's Fee Awards Act of 1976,

19   42 U.S.C. §1988, and other authority.

20                                              **IX.**    **JURY DEMAND**

21       9.1.    Plaintiffs hereby request and demand trial by jury.

22                                           **X.**    **PRAYER FOR RELIEF**

23       Wherefore, plaintiffs and each of them pray for relief as follows:

COMPLAINT FOR DAMAGES, INJUNCTIVE
AND FURTHER RELIEF - 30 of 33
{2340.01 - 00104794}

**VREELAND LAW PLLC**
CITY CENTER BELLEVUE
500 108TH AVENUE NE, SUITE 740
BELLEVUE, WASHINGTON  98004
(425) 623-1300 - FACSIMILE (425) 623-1310

1    A.    For award and entry of judgment in favor of each plaintiff against defendants

2    KCHA and Norman personally for all actual damages including past and future compensatory,

3    economic, non-economic, special, general and emotional distress damages; for pre-judgment

4    interest on liquidated amounts; for an enhanced amount to offset additional federal tax

5    consequences of any economic damages award; for punitive damages against Norman

6    personally; and for all remedies as alleged herein under federal statutory law and constitutional

7    claims pursuant to 42 U.S.C. §1983, 42 U.S.C. §1981, and 42 U.S.C. §4309.

8    B.    For award and entry of judgment in favor of each plaintiff against defendants

9    KCHA and Norman personally for all actual damages, including past and future compensatory,

10    economic, non-economic, special, general and emotional distress damages; for pre-judgment

11    interest on liquidated amounts; for an enhanced amount to offset additional federal tax

12    consequences of any economic damages award; and for all remedies under state law as alleged

13    herein under chapters 49.60 RCW, 49.58 RCW, and the common law.

14    C.    For award and entry of judgment against defendants KCHA and Norman

15    personally for reasonable attorneys' fees, costs, litigation expenses as permitted by state law

16    including under chapters 49.60 RCW, 49.58 RCW, 49.48 RCW, and 42.40 RCW; and as

17    permitted under federal law, including 42 U.S.C. §1988.

18    D.    For pre-judgment interest and post-judgment interest in the maximum amount

19    allowed by law.

20    E.    For injunctive and equitable relief based upon the long-term and agency-wide

21    discrimination, inequitable pay, and retaliation allowed at KCHA due to inadequate oversight

22    and remedial action, to ensure compliance with state and federal law through entry of an Order

23    mandating defendant KCHA, at a minimum, take the following actions:

VREELAND LAW PLLC
CITY CENTER BELLEVUE
500 108TH AVENUE NE, SUITE 740
BELLEVUE, WASHINGTON 98004
(425) 623-1300 - FACSIMILE (425) 623-1310

(1)     Adoption of mandatory term limits for members of the Board of Commissioners, and to promote diversity, community representation, and rotation of leadership roles;

(2)     Immediate correction and payment of inequitable compensation to various people of color and female staff, including but not limited to Pam Taylor and Therese Ross;

(3)     Adoption of an equity plan for equitable career advancement opportunities for all people of color and female staff;

(4)     Adoption of an equitable compensation plan for all employees who are female and/or people of color;

(5)     Adoption of a complaint handling and investigative plan, which is transparent and neutral, for all reports as to alleged unlawful discrimination including retaliation;

(6)     Adoption of mandatory periodic reports of racial and gender diversity in hiring, promotions, demotions, terminations, salaries, merit increases, professional development training, and conference participation for each employee group category per department and for Senior Staff and Executive Leadership Team members; and

(7)     Adoption of requirements for annual written performance evaluations of the Executive Director by the Board including compliance with anti-discrimination laws, and with KCHA's equitable compensation and career opportunities plans.

F.      For such other and further relief as the Court deems just and proper.

/ / /

/ / /

COMPLAINT FOR DAMAGES, INJUNCTIVE
AND FURTHER RELIEF - 32 of 33
{2340.01 - 00104794}

VREELAND LAW PLLC
CITY CENTER BELLEVUE
500 108TH AVENUE NE, SUITE 740
BELLEVUE, WASHINGTON  98004
(425) 623-1300 - FACSIMILE (425) 623-1310

1    DATED this 12th day of May, 2022.

2

3               VREELAND LAW PLLC

4               By: s/ Victoria L. Vreeland
                By: s/ Diego A. Rondón Ichikawa

5               Victoria L. Vreeland, WSBA No. 08046
                Diego A. Rondón Ichikawa, WSBA No. 46814

6               VREELAND LAW PLLC
                500 108th Avenue NE, Suite 740

7               Bellevue, WA  98004
                Tel:  (425) 623-1300

8               Fax:  (425) 623-1310
                Email:  vicky@vreeland-law.com

9               Email:  diego@vreeland-law.com

10             Attorneys for Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23